## Rigney *v.* Snellenberg & Co., Appellant.

*Workmen's Compensation Law—Loss of use of hand—Disability caused by treatment of attending physician.*

In a claim for compensation under the Workmen's Compensation Act; for the loss of the use of a hand, an award will be sustained, where it appears that the claimant in the course of his employment received a blow on the hand and that the disability sustained was directly attributable to the manner in which the hand was treated by the physicians having the case in charge.

Argued November 10, 1926. Appeal No. 287, October T., 1926, by defendant from judgment of C. P. No. 5, Philadelphia County, March T., 1926, No. 1187, in the case of John J. Rigney v. N. Snellenberg & Co., Defendant, Maryland Casualty Company, Insurance Carrier. Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN and CUNNINGHAM, JJ. Affirmed.

Appeal from award of Workmen's Compensation Board. Before MARTIN, P. J.

The facts are stated in the following opinion of the court below:

Claimant was employed in the kitchen of defendant. While engaged in the work incident to his employment, he was assaulted and struck on the left hand with a coffee pot by another employee. He claims to have been permanently injured. There was evidence that he was the victim of syphilis, and that the

loss of use of his hand was due to the progress of that disease, and was not caused by the injury.

The Referee to whom the claim was referred, after hearing testimony, reported—"That every possible opportunity was given the claimant to produce the fullest testimony in his behalf, and additional hearings were set for that purpose. The question of the relation of the accident to the condition complained of, as well as the true condition of the hand, is largely a matter of medical opinion." One doctor expressed the opinion that there was a fracture of the wrist. The attending physician expressed an opinion when shown X-ray photographs taken at the time of the accident, that the condition indicated by the photographs had existed for some time, and was due to arthritis. The doctor who treated claimant on the day of the accident and took X-ray photographs of the hand was chief medical director for the insurance carrier; he expressed the opinion that the condition of the hand was caused by arthritis, or syphilis, and that it was not caused by the accident. A specialist in syphilology after examining claimant, expressed the opinion that his condition was not of recent origin, or the result of accident, but was due to the systemic condition from which he was suffering.

In his report the Referee stated—"From the whole record, taking the weight of the medical testimony and observance of the Referee of claimant and the witnesses before him, he is forced to the conclusion that any condition from which the claimant may now be suffering or did suffer, was not the result of or due to the accident." He disallowed the claim.

An appeal was filed by claimant, and it was alleged that the evidence showed conclusively that the disability was due solely to, and entirely the result of the injury inflicted by the assault upon claimant while he was in the employ of defendant.

A hearing de novo was directed by the board. Under authority of the power vested in the board by Section 420 of the Act of June 26, 1919, P. L. 642, Commissioner Houck issued an order in the name of the board, appointing an impartial surgeon to examine the injuries of claimant and report thereon. The order read—"In this case, which involves the question whether the claimant's disability is due to the accidental injuries sustained, the board desires the testimony of an impartial expert. It is therefore ordered that the claimant present himself to Dr. Charles F. Nassau for examination, after which examination and report by Dr. Nassau, a time and place for hearing will be fixed."

Dr. Nassau reported to the board that he made a careful examination of the claimant. That he did not see the X-ray pictures of his wrist, but that was not important; from the statement made by the claimant, he is of opinion that the amount of injury he might have received has no bearing on the condition from which he suffers. "Mr. Rigney's present condition is attributable to the application of a too tight bandage which, as is well known, may cause the loss of an arm from gangrene. The condition is known as ischemic myositis or Volkman's contracture, Volkman's paralysis, ischemic paralysis, or ischemis muscular atrophy with contracture and paralysis ...... To speak plainly, Mr. Rigney is a victim of improper treatment at the hands of his employer. Considering the length of time that this condition has gone unrecognized, his cure is highly problematical." Dr. Nassau subsequently appeared before the board as a witness, testified in chief and was cross-examined.

It was agreed by counsel that the testimony taken by the Referee, should be adopted as though taken before the Workmen's Compensation Board in the

240   RIGNEY v. SNELLENBERG & CO., Appellant.

hearing de novo, and considered in the final disposition of the case.

Claimant testified that he had a perfect hand before the accident, and that he had not been able to use it since; that it became swollen ten minutes after he was struck—it swelled immediately, and pained him for a long time after being hurt, and that it got stiff at once.

Dr. Curry, a graduate of Jefferson Medical College, in practice 34 years, testified that he diagnosed the injury to be a fracture of the metacarpal bone, and that a very painful operation would be required to cure the condition. When the X-ray photographs were shown him, he stated—"An X-ray picture isn't a positivism, it is only a thought." He was asked on cross-examination—"Q. Your diagnosis of this case rests entirely upon your human experience and your brains?" and replied—"Yes, thank God for that. I seen more mistakes made by X-ray examination more than anything in my life. Q. Does this picture show any evidence of a fracture? A. That proves nothing. It is like a photograph of a man's face, it doesn't show the real face. Q. You are basing your opinion entirely on your own experience and your general brains? A. Yes, and my actual knowledge of thousands of cases of the same kind. Q. You refuse to take into consideration the X-ray picture I just showed you in forming an opinion as to whether or not Mr. Rigney had a fracture in that hand? A. Yes. Q. Assuming that I prove to your satisfaction that this is an X-ray picture of Mr. Rigney's left hand, would that alter your opinion? A. Not a bit. I put my experience above mechanics. Q. Can you see anything in that picture that suggests that it has been improved upon, or anything but a bona fide X-ray? A. Nothing would change me, I've had many cases where X-rays were made and didn't turn out to be true. Photograph is not brain."

Dr. Kinloch, a graduate of the University of Pennsylvania in 1911, surgeon in chief for the Maryland Casualty Company, intervening defendant, testified that he first saw claimant on the day of the accident; the back of his left hand was swollen and discolored between the wrist and knuckles, and the bones over the wrist; at that time there was a distinct deformity of one of the carpal bones which form the wrist. Witness took several X-ray pictures which, he claims, show a diseased condition of the metacarpal bone of the left hand and wrist and extensive bony deposits in the joints, but disclose no evidence of a fracture, which he asserted would show if it existed. The X-ray of the right hand, he stated, shows a diseased condition of the head of the first metacarpal bone in the region of the thumb. He testified that on the day X-rays were taken, he took a specimen of plaintiff's blood, and that the analysis showed a four plus Wasserman positive, which indicated that plaintiff was suffering from syphilis. In view of this report, the diseased condition of the bone shown by the X-ray photographs, in the opinion of this witness, is due to syphilis. Witness stated that under his treatment the acute swelling of the injured hand disappeared, and that he did not consider claimant needed any more treatments for the condition arising from the blow. It is his opinion that claimant's disability "is due to an osteo-arthritis of the joint between the metacarpal bone of the thumb and the second metacarpal bone and the bones of the wrist." He was asked—"In your opinion, what relation is there between that condition and the accident he sustained on April 16th," and replied—"No relation whatsoever. Q. Assuming that he had syphilis previous to this accident, and that he had this arthritis which the X-ray, taken on April 16th, revealed, what is your opinion as to the effect of the accident on that condition, either temporary or permanent effect? A.

It should not have any permanent effect on the condition. Of course we understand he was struck a blow on the back of the hand and he suffered a pretty severe contusion there, and, of course, he had the effect of that contusion. Q. Did he recover from the effects of that contusion? A. Yes." .

On cross-examination the witness was asked—"Assuming that at the time of this accident, the bones were affected due to the presence of syphilis in the system, would a blow on the wrist light up or aggravate the syphilitic condition? A. I think a blow on the bone that is infected with syphilis would be more liable to cause a fracture of the bone, because the bone is weakened. Q. If you have a diseased bone condition and a blow at that point, will there be any contributory cause to its recovery that would not exist if that diseased bone condition was not there? A. Yes, I think any diseased part will not recover from an injury as quickly as a person in good condition. Q. So if you have a diseased bone condition any blow at that point will be apt to aggravate it? A. If it is severe enough. Q. So the only question we have to bother with here is the question of the degree of the blow he received. A. Yes"—Witness added—"I would like to explain something in these X-rays. There is a condition with that bony deposit and ankylosis of the joints there that could not possibly form only over a long period of time. That must have been present before the day of the accident, and the X-ray, taken on May 22nd, showed no change. In other words, the bony condition seemed to be the same. Q. If the man had perfect use of the hand before, you would not assume the subsequent condition to occur from syphilis? A. If he had perfect use of the hand before the accident, I would not. You are asking me to assume he has perfect use of the hand.

Q. Yes. A. If he had perfect use of the hand before this accident, with no limitation of motion, it must

have been caused by the accident, if I could assume that.''

The claimant denied under oath that he ever had a syphilitic disease or anything of the kind, and swore that his hand was in excellent condition before the accident. Dr. Heyser, a graduate of Jefferson Medical College in 1903, testified he had treated claimant from time to time for twenty years, that before the accident his hand was perfectly all right, and he was able to use it. When asked as to the present condition of the hand, he replied—''It looks to me as if he had a dislocation and possibly he may have some fracture of the carpal and head of the radius bone at the joint.'' Witness was shown the X-ray photographs and testified—''There is unquestionably a dislocation there or tearing of ligaments, causing the carpal bones to separate from the radius bones.'' ''Q. Isn't the condition that these X-rays present one that could be due to his syphilitic condition? A. I would not say as a cause, but I would say as a prevention of healing.''

He admitted that if the X-ray pictures showed the exact condition of the hand, directly after the accident, he would say that those pictures signified a condition that had existed for some time. When asked whether it had relation to the accident, he replied that he would not want to say—that it was possible that there might have been some difficulty there previous to the accident, but made worse by the accident. ''Q. Is this condition you found in this hand, one that could be due to syphilis? A. It is impossible to say in a small bone whether it is due to syphilis, inflammation or protrusion of the bone due to fracture. It is absolutely impossible to say.''

He was asked on cross-examination—''If a person suffering from the disease, with which the claimant was afflicted, without showing external evidences of it, was assaulted with violence—and the bones were in

the position shown by the X-ray photograph, would you attribute it to syphilis or the blow''? Witness replied—''Considering his previous history, I would say to the assault.''

The Referee asked him if a wrist joint, affected by a syphilitic condition, receiving a blow, would recover as if it were not so affected, witness replied, ''Unquestionably not. Q. Would that condition, syphilitic condition, be lit up or aggravated by an assault at that point? A. Yes, and oftentimes prevents the healing of the bone permanently.''

Referring to the X-ray pictures taken on the day of the accident, he was asked his conclusion as to the probable cause of the present condition of the claimant's left hand and arm, ''Referring now to what you have diagnosed the present condition, is that the result of a fracture or dislocation of the bone.'' His reply was, ''I would say the result of the accident.''

Several witnesses who worked with claimant and associated with him, testified there was nothing apparently the matter with his hand prior to the accident.

Dr. Hudson, a graduate of Jefferson Medical College in 1903, after examining the X-ray pictures, stated that he did not see anything that could be due to the blow, but that if the bone was weakened by a syphilitic condition, he would imagine that a comparatively slight blow sustained at the point of disease would cause a crushing down of the bone, and added, ''I find no evidence of crushing or breaking down of any external force.'' He was asked, ''What is the cause of the weakness in that hand''? And replied, ''I don't know.'' On cross-examination he stated, ''A condition of that kind could result from a blow but, the evidence would not show immediately as it did here.'' Referring to the photograph he said, ''There is no evidence of external traumatism shown

on these plates''; and when asked if he would diagnose the condition as being caused entirely by syphilis, replied, ''Yes. Q. So in your diagnosis you gave no weight to the blow on the hand? A. No, because there was no evidence of crushing the structures externally.''

Dr. Klauder, a graduate of the University of Pennsylvania, in 1912, and a specialist in syphilology, for ten years, was shown the X-ray plates, and asked, ''Assuming that the man had an accident on April 16th, and had an X-ray picture taken on the same day, within a few hours, and assuming you had the benefit of these tests, will you tell the Referee your opinion regarding the relation between the accident and the condition that has affected him since? A. I cannot see any evidence of anything in the picture resulting from an injury. Q. What would you expect to find if there was an injury there? A. One would find a fracture or break in the continuity of the bone. Q. Do you see anything like that there? A. No. Q. Assuming that he had this accident on April 16th, as the consequence of which he was treated, and the hand was put in a splint, and assuming that he had syphilis four plus, assuming that the X-ray marked 'A' was taken within a few hours after the accident, and showed the condition which you have noted, and assuming further that another X-ray was taken five weeks later showing no change in the condition of the left hand, what is your opinion of the relation of the accident that he had in April, to the condition that his hand is now in? A. The evidence upon which I base my opinion certainly justifies the conclusion that there was no evidence of any injury or the result of any injury. From the evidence submitted to me, I see no reason to believe that the injury has caused any disability. It is not logical to believe that the injury sustained to the flesh produced permanent disability. ...... There is nothing to make me believe the injury had any part in the alleged

condition now. ...... I don't believe there is a permanent disability." When asked, "Could such a condition be hastened or accelerated by a blow or injury at or about that part," he answered, "I cannot deny that it might. Q. So that even short of a fracture to the bones, a syphilitic condition in the system might where there is a blow on the particular part, hasten the development of the condition you now find there? A. Yes, it might." The witness added that the pictures displayed to him did not justify the thought that the accident had hastened the course of the disease. "From the evidence, my conclusion is that there is no permanent disability. ...... . The evidence does not support the belief there is a disability. ...... I don't believe it was in any way due to the traumatism." He was asked, "Do you mean the traumatism might have contributed," and answered, "No, I don't believe so. ...... I don't know as to why he has the amount of disability he has. ...... If the syphilis lit up, my conclusion would be that the syphilis plus the traumatism made a role." He was asked, "How would you eliminate in your final diagnosis the presence and the history of traumatism under the hypothetical state of facts" and replied, "I could not eliminate the traumatism. Q. So that the traumatism would be an agent in producing any such lessening use? A. Yes it might. Q. And that would be the original conclusion if you had the presence of traumatism in your history? A. Yes, we are assuming the man's hand was normal. Q. There is no question but that traumatism in producing a fracture or dislocation can light up and aggravate and accelerate a syphilitic condition? A. Yes."

The power of the Court is limited in disposing of this appeal to a determination of the question whether there is evidence to support the findings of the board and the law was properly applied to them. Roach v. Oswald Lever Co., 274 Pa. 139.

In Guyer v. Equitable Gas Co., 279 Pa. 5-7, it was claimed that the employe had been injured by a fall which resulted in his death. The family doctor expressed the opinion that the fall had caused the rupture of blood vessels which, in turn, had caused the rupture of a cyst which caused death, and but for the accident decedent might have lived for years, notwithstanding his diseased condition. Other doctors expressed the opinion that the rupture of a cyst, which all agreed was the immediate cause of death, was from natural causes wholly apart from the accident. It was held that, "The testimony of the family doctor was competent and if credited, which was for the Referee and Compensation Board, justified the finding that the accident was the superinducing cause of death; if so, the fact that his diseased condition might ultimately have caused death is no defense." It was said in the opinion, "There being legal evidence to support the findings, they cannot be disturbed either in the lower Court or on appeal."

"Both the Courts and the administrative authorities have, very properly, been most liberal in construing the Workmen's Compensation Law, holding that claims thereunder need not be made out with the same exactness of proof required in suits at common law." Fink v. Sheldon Axle & Spring Co., 270 Pa. 476-479.

Dr. Sturgess, the physician in charge of Snellenberg's dispensary, was called as a witness and testified that at the time of the accident, a loose bandage was applied and removed for the purpose of taking the X-ray; that the hand was very much swollen and there were indications of a break in the metacarpal bone.

Dr. Kinloch, the attending physician was also called as a witness and testified that he did not put the bandage on tight, but allowed for a swelling and removed it the next day; that there was nothing to suggest that the bandage was too tight, no symptoms of a tight

bandage. The swelling, he said, disappeared after April 29th.

Dr. Nassau testified that the accident would cause swelling, and that swelling might tighten the bandage. He was asked, "The X-ray wouldn't have any bearing on your opinion, whatever? A. None whatever. Q. And that is because the accident itself had nothing to do with the case? A. No, pardon me. The accident makes the swelling, and insofar as the condition of the swelling may have something to do with the tightening of the bandage, the accident has something to do with it. But what I want to make clear is that the injury he received apart from collateral force wouldn't cause a contracture of the tendons. Q. Then his condition today is the result of a constricture? A. Of his injury —absolutely. You can't separate the treatment from the injury. Q. Was the injury itself the producing or probable cause of the constricture? A. Surely, because it came about by treating the condition, and that developed the constricture. Q. This is a condition that followed because of the nature of the injury or because of the character of the treatment? A. The character of the treatment. Q. And if he had received this character of treatment, without receiving any injury, he would be in the same condition wouldn't he? A. I doubt it, because there was a swelling there right away and there was a splint applied which resulted in the constricture. Q. So that the injury in this particular case is without significance except that it was—— A. Followed by treatment. Q. And it is the treatment that caused his condition? A. Yes, he wouldn't have been treated if he hadn't had his injury—so there is your cycle. Q. But the injury only happens as a fact in this particular case? A. Yes. It is not a producing cause of his condition. A. I don't think so; I don't know, I tell you nobody knows, I wish I did. Q. I understand it is your testimony that the injury Mr. Rig-

ney received is not the producing cause of Mr. Rigney's condition? A. As far as I know it is not. I don't say it is not possible, I don't know."

The findings and decisions of the Board upon the appeal from the Referee's disallowance of the claim for compensation were filed by Commissioner Houck. After reviewing the history of the accident, and the medical treatment of claimant the report without discussing the conflicting medical testimony taken by the Referee, states that, "Dr. Nassau's evidence without any doubt gives the true explanation of the claimant's condition. ...... Of course, the accident caused the bandaging, and consequently the accident is the cause of the claimant's disability; the loss of use of the claimant's left hand due to Volkman's ischemic paralysis resulted from disease which naturally resulted from the violence to the physical structure of the claimant's body sustained while he was in the course of his employment."

Compensation was awarded to claimant.

Defendant and the insurance company appealed from the award and filed exceptions claiming that the evidence is legally insufficient to support the findings; and alleging that after the hearing *de novo* and before the decision of the Workmen's Compensation Board, defendant filed a petition for a further hearing, but that the Board disposed of the case without passing upon defendant's petition.

A certiorari issued and the record was certified to this Court.

[1][A careful examination of this record fails to disclose a copy of the petition which defendant alleges was filed praying for a further hearing. No order of the Board granting the prayer of the petition is in the record. There is nothing to indicate the basis for the request, or the character of evidence which defendant proposed to offer.][1]

"Before a case of this kind will be sent back for reconsideration, it must appear that relevant matters, essential to a proper determination of the controversy, had not been sufficiently inquired into." Thomas v. State Workmen's Insurance Fund, 280 Pa. 331-334.

In view of the very full hearing before the Workmen's Compensation Board, it was not error in the Board in refusing to further continue the case. [1][There is nothing on the record to suggest the necessity for a further hearing.][1]

[2][There was testimony on behalf of claimant that his hand was in good condition before the accident, so far as capacity to use it was concerned, and evidence that from the time of the accident and immediately thereafter until the present time, it has been useless.

If this Court was required to determine the facts much might be said in favor of the finding of the Referee and his refusal to award compensation; but the Court is not required to consider the weight of the evidence or credibility of the witnesses. The law requires that the finding of the Board shall be affirmed if there was any substantial evidence upon which the findings could be based.

Dr. Nassau called as a disinterested witness to inform the Board declared absolutely that in his opinion the cause of permanent injury to the claimant's hand was the surgical treatment he received, and traced the necessity for the treatment to the accident. This testimony measured up to the requirement of McCrosson v. P. R. T. Co., 283 Pa. 492-495, in that the witness expressed the opinion that the result in question most probably actually came from the injury, and did not restrict his opinion to suggesting that the result in question most probably (might have come) from the cause alleged. Watson v. Lehigh Coal & Navigation Co., 273 Pa. 251-254. "The opinion expressed, as to

the casual connection, was definite and not subject to objection on the ground of uncertainty.''

Dr. Nassau's opinion as to the effect of the injury upon the claimant was adopted by the Board. Their action was based upon substantial evidence which they chose to accept and it was within their province to disbelieve the testimony of the two physicians who denied that there had been any tight bandaging of the hand.]²

Upon the completion of the hearing by the Board the findings of fact and the award were stated in writing, and the disallowance of compensation by the Referee reversed.

Within the statutory period the claimant took an appeal to the Board from the disallowance of compensation by the Referee, and from the decision of the Board awarding compensation to claimant, defendants appealed on the ground that the finding of fact and allowance of compensation were unwarranted by the evidence.

And now, to wit, this 24th day of August, 1926, the award of the Workmen's Compensation Board to John J. Rigney is affirmed, and judgment is entered in favor of John J. Rigney, claimant, against the defendant, N. Snellenberg & Company for $10.80 per week, for a period of 175 weeks beginning April 27th, 1924, a total of $1890.00.

The court affirmed the decision of the Compensation Board. Defendant appealed.

*Error assigned* was the judgment of the court.

*Louis Wagner,* and with him *R. A. Smith* and *W. F. Whittle,* for appellant.

*J. Joseph Murphy* for appellee.

OPINION BY HENDERSON, J., March 3, 1927:

The clear and comprehensive opinion of the court below relieves us from the necessity of discussing the evidence taken by the referee and by the compensation board. The finding of the latter was that the disability sustained by the plaintiff was directly attributable to the manner in which the hand was treated by the physicians having the case in charge. In the opinion of Dr. Nassau the bandages applied were too tight with the result that the patient suffered contracture and muscular atrophy of the wrist. The condition was a rare one and not necessarily involving mal practice. A swollen hand and wrist and a tight bandage, made so perhaps by an increase of the swelling, were the conditions causing the plaintiff's loss of the use of his hand. The evidence was direct that the swelling immediately followed the blow on the hand. There was a close and immediate connection therefore between the violence applied and the bandage treatment: Hornetz v. P. & R. C. & I. Co., 277 Pa. 40. There was sufficient evidence to sustain the finding of the board and support the judgment of the court.

The judgment is affirmed.