## Hurchick v. Falls Township Board of Supervisors

*Harold S. Patton,* for appellant.

*Biester & Ludwig,* for appellee.

FULLAM, J., April 5, 1963.—In the performance of his duties as a volunteer fireman, claimant in this workmen's compensation proceeding was injured when he fell from a ladder on May 10, 1957. A compensation agreement was entered into, and benefits for total disability were paid to and including December 15, 1957. On June 2, 1958, defendant-carrier filed a termination petition, alleging that claimant had completely recovered and his disability had ended as of December 15, 1957. Claimant filed an answer averring continued disability.

On April 6, 1959, the referee entered an order denying the termination petition and awarding additional benefits for total disability up to and including January 6, 1958, and partial disability at the rate of $27.50 per week thereafter. On appeal by the carrier, the Workmen's Compensation Board set aside the award and referred the case back to the referee for the appointment of an impartial medical examiner. After

further hearings, at which the impartial medical examiner testified and presented his report, the referee, on April 21, 1960, entered an order denying the termination petition and awarding benefits to claimant on substantially the same basis as his original award. The carrier appealed, and the Workmen's Compensation Board, in an opinion filed December 21, 1960, reversed the award, set aside the referee's findings and conclusions, terminating all compensation as of January 6, 1958. Claimant has appealed to this court. Although the appeal was filed with this court on January 10, 1961, the case was not ordered for argument until October 17, 1962; argument was heard on January 22, 1963.

A party seeking to modify or terminate a compensation agreement has the burden of proving the cessation of disability, or other change in status, alleged: Downing v. Leechburg Mining Co., 195 Pa. Superior Ct. 574 (1961); Boyle v. Boyle, 174 Pa. Superior Ct. 188 (1953). In the present case, the Workmen's Compensation Board, which is the ultimate fact-finder in these cases, has found that defendant-carrier has met its burden of proof. Substituted finding of fact no. 2 specifies that "all disability as a result of the accident ceased" as of January 6, 1958. The scope of our review on this appeal is limited to inquiring whether there is competent evidence in the record to support the findings of the board: Jessie v. Dash, 194 Pa. Superior Ct. 1, 10 (1960) and cases cited.

It is virtually undisputed, and the compensation authorities found, that claimant is still suffering from partial disability, to the extent of about 20 percent. The board found, and there is ample competent evidence to support the finding, that this continuing partial disability is due to the aggravation of a spinal cyst precipitated by an exploratory myelogram performed by claimant's physician some 18 months after

the accident. The board's substituted finding of fact no. 4 is as follows:

"4. Claimant is presently 20% partially disabled as a result of the aggravation of the meningocele by a myelogram performed on October 13, 1958. *The myelogram was performed for reasons unrelated to claimant's injury of May 10, 1957.*" (Italics supplied.)

Accordingly, our decision of this appeal turns upon the narrow question of whether or not there is competent evidence in the record to support the board's finding that the operation was performed for reasons unrelated to the accident. We have reviewed the entire record with great care, and have been unable to find any evidence whatever to support such finding. In fact, the only direct medical evidence on the subject, the testimony of claimant's physician and the impartial medical witness, is to the contrary.

It is undisputed that, in his fall from the ladder, claimant fractured the transverse processes of two vertebrae on the right side of the lumbar spine. Initially, it was thought that he had also suffered a linear fracture on one transverse process on the left side of his lumbar spine; the compensation agreement which was entered into at the time so stipulates, but later studies indicate that this finding may have been erroneous. At any rate, both sides seem to concede that the latter possible fracture is of no present significance.

Unknown to claimant or anyone else, claimant had a deformity in the bony structure of the sacrum at the base of the spine, a defect which makes possible the protrusion of the lining of the spinal cord. In October of 1958, some 18 months after the injury, it was established that the lining of the spinal canal, or meninges, had, in fact, protruded through this bony defect and had formed a cyst, or meningocele. Everyone agrees that the defect in the bony structure of the sac-

rum existed since birth, and was not in any way caused by the accident.

It was the position of claimant's medical expert that the blow to the spine suffered in the accident caused a sudden increase in the fluid pressure in the spinal column, and either produced, or aggravated and enlarged, the meningocele or cyst. Defendant's medical expert, an orthopedic specialist, last examined claimant in December of 1957, some 11 months after the accident. He testified that at no time did he observe any indication of the existence of a myelocele (meningocele) or other kind of sacral cyst, and that if such a cyst had been present, it would have produced neurological signs readily identifiable as such.

Both the referee and the board found as fact that the accident itself neither caused the formation of the cyst, nor aggravated an existing cyst. On the contrary, both the referee and the board came to the conclusion that claimant's own physician unwittingly brought about the aggravation of an existing cyst when he performed a myelogram on claimant in October of 1958. The myelogram procedure consists of introducing into the spinal canal a quantity of liquid containing a radioopaque dye material, so that x-ray photographs of the patient's spine at various angles from the horizontal may reveal obstructions, narrowings, herniations, and other defects. The impartial medical witness concluded that in the present case, the dye material entered the meningocele and distended or irritated the cyst.

Claimant testified that he had never had any trouble with his back before the accident, and that the pain, tenderness and other symptoms which he described have continued without interruption since the date of the accident. Defendant's medical witness admitted that when he last examined claimant on December 16, 1957, claimant still had symptoms, and there was muscle spasm in the area of the lumbar spine which

could be noted objectively. It was his opinion that the fractures themselves had long since healed, and that claimant should have had more exercise and received physiotherapy treatments in order to bring about the absorption of the scar tissue surrounding the fractures, and that this course of action would result in a complete recovery. Claimant's physician testified that claimant was constantly complaining of symptoms from the date of the accident to the date of the myelogram and that he performed the myelogram after consultation with, and at the suggestion of, a competent neurosurgeon, in order to determine the possible presence of a disc injury. The impartial medical witness, Dr. Stein, testified on this subject as follows:

"I am using hindsight now when I say it should not have been done. I think it caused the fellow more damage than it did him any good. I can say that I don't think I would have done it, and I would not want to be that positive of it. With a patient who is continuing to complain of pain you might be inclined to go ahead. . .

"The only question here is the iatrogenic question. He was complaining of pain and because of that the doctor did a procedure when the procedure was ill-advised or not important. There was some justification when it was done. This is a bit like a patient who undergoes an operation and gets an infection."

Where claimant in good faith seeks medical treatment for his injury, and the medical treatment itself either aggravates the existing injury or causes new or additional injury, the law regards the latter as having been caused by the original accident. Thus, in Rigney v. Snellenberg & Co., 90 Pa. Superior Ct. 237 (1926), where claimant injured an already diseased hand, causing temporary swelling, and the hand was bandaged too tightly, resulting in gangrene and the ultimate amputation of the hand, an award to claimant for loss of the hand was sustained. Similarly, it has

been held that compensation is payable for disability or even death resulting from an anesthetic used in an operation to treat the original injury (Yost v. Susquehanna Pipe Line Co., 138 Pa. Superior Ct. 502 (1939); Hornetz v. Philadelphia and Reading Coal & Iron Co., 277 Pa. 40 (1923)); or where the death was caused by an antitetanus injection (Flowers v. Canuso & Son, 115 Pa. Superior Ct. 234 (1934)); or where death resulted from a heart attack precipitated by shock and fright at the prospect of having a splinter removed surgically: Yunker v. W. Leechburg S. Co., 109 Pa. Superior Ct. 220 (1933).

The subsequent aggravation or new injury is attributable to the original accident even in cases of mistaken diagnosis, unnecessary operations and negligence in treatment: Restatement of Torts, §457; Nathan v. McGinley, 342 Pa. 12 (1941); Thompson v. Fox, 326 Pa. 209 (1937); Wyatt v. Russell, 308 Pa. 366 (1932); Wallace v. Pennsylvania R. R. Co., 222 Pa. 556 (1909). And see Rigney v. Snellenberg & Co., supra.

It seems probable that certain limitations to the generality of the foregoing principles should be observed. While we have not been made aware of any reported decisions on the subject, it seems only logical to conclude that if the patient is actually malingering, that is, fabricating symptoms, and additional injury results from medical procedures designed to treat the alleged symptoms or to ascertain the cause thereof, such additional injury could not be attributed to the original accident. By the same token, if the subsequent exploratory or diagnostic procedure discloses that the symptoms stem from some cause unrelated to the accident, it would seem that the exploratory operation and any damages caused by the operation should be attributed to the condition which produced the symptoms, even though the parties may originally have thought

that the symptoms were produced by the accident. But if a claimant genuinely experiences symptoms after an accident which were not present before the accident; and if his doctor in good faith performs a myelogram to determine the cause of the symptoms, and the myelogram causes disability, the disability is compensable even though the myelogram does not affirmatively establish that the symptoms were due to the original accident. In such a situation, the employer and his carrier can be relieved of liability for the disability occasioned by the myelogram only if it is established either (1) that claimant did not, in fact, experience the symptoms complained of, whose cause was being sought by the myelogram procedure, or (2) that the symptoms were produced by some cause unrelated to the accident.

In the testimony of defendants' expert and the impartial experts, and to some extent in the opinion of the board, there is discernible the suggestion that claimant's symptoms may not have entirely derived from organic cause; there are overtones of possible hysteric exaggeration of symptoms. But there is no finding that claimant was malingering, or that he did not genuinely experience the symptoms expressed. Cf. Alexander v. Knight, 197 Pa. Superior Ct. 79 (1962), affirming 25 D. & C. 2d 649, 659, to the effect that the fact that an injured person's neurotic tendencies may have produced exaggerated subjective symptoms and delayed the normal period of recovery does not mean that compensatory damages are limited to payment for such consequences as a normal person would have experienced.

In the present case, the compensation authorities had the clear right to reject, as they did, the testimony of claimant's physician that the meningocele was produced or aggravated by the trauma of the original fall from the ladder. They also had the right to accept as

they did, the testimony of Dr. Stein that the aggravation of the meningocele was due entirely to the myelogram. The fact remains, however, that the myelogram was performed in order to ascertain the cause of symptoms, some and perhaps all of which would seem on this record to relate to the original accident.

Dr. Stein did testify that certain symptoms which claimant told him on December 2, 1959, he had first experienced some four months after the accident, when he was ordered to exercise, were too late to support the theory that the fall itself aggravated the cyst. But this does not rule out these symptoms as justifying the myelogram, and, obviously, does not eliminate other factors, such as muscle spasm, as justifying the myelogram. Defendants' arguments on this point erroneously assume that the claimant had completely recovered by January 6, 1958, and remained free of symptoms and complaints until September 1958; the record is to the contrary. Claimant received no treatment during that period, but according to his doctor was constantly complaining. In the absence of a finding, supported by competent evidence, that the symptoms were not genuine, or that they were caused by something other than the accident, the findings and conclusions of the board cannot stand.

It must be emphasized that this is a proceeding to terminate the compensation agreement, and the burden of proof is on defendants. The board having found that disability never terminated, it was incumbent upon defendants to isolate the existing disability from the accident. Even if the board rejected all the medical testimony as to the reasons for performing the myelogram, the result would be merely the absence of any basis for a finding either way on the subject; defendants' burden of proof would not be met.

The record is otherwise insufficient, as well. There is no evidence in the record to substantiate the date of

January 6, 1958, as the date of termination of disability due to the accident. It is true that defendants' doctor recommended that claimant ought to go back to work, both in his report of his September 1957 examination, and also in his report of his December 1957 examination. But it is clear from his testimony that claimant still had muscle spasm and other symptoms related to the accident. The only evidence in the record relating to the date January 6, 1958, is that on that date claimant's physician certified that claimant had recovered from the immediate effects of the accident and was able to do light work. But claimant's work consisted of unloading and manually rolling heavy pipe, and there is no evidence in the record that plaintiff was ever able to perform that kind of work after the accident. The uncontradicted evidence is that the employer would not permit him to work unless he produced a certificate that he was fully recovered and able to perform his normal duties. There is no evidence that any light work was available to claimant.

We have disposed of this matter on the basis of the record certified to this court by the board as constituting the complete record. Reference is made in the record to certain exhibits, but these do not appear in the record certified to us. The nature of the exhibits referred to is such that they could not affect the conclusions we have reached. Since we are remanding the record to the board for further proceedings, the board will be in a position to rectify any omission by incorporating in the record any exhibits which should have been included.

### Final Order

And now, April 5, 1963, for the reasons set forth in the foregoing opinion, findings of fact nos. 2, 3 and 4, and conclusion of law no. 3, are hereby vacated and set aside; the order of the Workmen's Compensation Board dated November 25, 1960, and entered Decem-

ber 21, 1960, is reversed, and the entire record is remanded to the Workmen's Compensation Board for further proceedings not inconsistent herewith.